THE SEHAT LAW FIRM, PLC
Cameron Sehat, Esq. (SBN: 256535)
18881 Von Karman Avenue, Suite 850
Irvine, CA 92612
Telephone:  (949) 825-5200
Facsimile: (949) 313-5001
Email: Cameron@sehatlaw.com

Attorney for Plaintiffs, Chrysie Anagnostou, as
Personal representative to the Estate of Stella Summers
And in her individual capacity

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CHRYSIE ANAGNOSTOU, as
Personal Representative of the Estate of
STELLA SUMMERS, and individually

Plaintiff,

vs.

COUNTY OF LOS ANGELES,
ZHAOJUN HUANG, individually;
LUZMINDA WEE individually;
MARA ALEJANDRA SIGALOS-
RIVERA, individually; JEFFREY
BERNARD CANCEKO,  individually;
DANIEL LEE JOHNSON, individually;
ARNOLD TSAI, individually; IRENA
PETROVICH, individually; MARIA
LITCHEL CAPIRAL, individually;
EDITH EZEANI, individually;
SABRINA REGENSBURG,
individually; STEPHANIE
ZANBRANO, individually; LUCIA
SANDRA GONZALEZ, individually
SULLIVAN, individually; SAMUEL
TOMICH; individually; MORRIS,
individually; and DOES  1 through 10,
inclusive,

Defendants.

Case No.: 2:19-CV-08111-VAP-PLA

## SECOND AMENDED COMPLAINT

1. **Deliberate Indifference to a
   Substantial Risk of Harm to Health
   (42 U.S.C. § 1983 and 14th Am. of
   U.S. Constitution)**
2. **Unreasonable Seizure-4th Amendment
   Violation-42 U.S.C. § 1983**
3. **Battery (State)**
4. **Medical Negligence (State)**
5. **Negligence (State)**
6. **False Imprisonment (state)**
7. **Failure to Train (42 U.S.C. §1983)**
8. **14th Amendment Due Process Violation
   (42 U.S.C. §1983)**

## DEMAND FOR JURY TRIAL

-1-

## PRELIMINARY STATEMENT

1. Plaintiff, Chrysie Anagnostou, is the biological mother and successor-in-interest to, Stella Summers, the decedent. Chrysie Anagnostou is also acting in the capacity of a personal representative of the Estate of Stella Summers.

2. Plaintiff, on behalf of Decedent, a patient at the Los Angeles County –USC hospital, hereinafter referred to as "LAC-USC", operated by the County Los Angeles, brings this action against the County of Los Angeles ("COUNTY"), LAC-USC medical staff, HUANG ZHAOJUN, individually**;** MARA ALEJANDRA SIGALOS-RIVERA, individually; JEFFREY BERNARD CANCEKO, individually; DANIEL LEE JOHNSON, individually; ARNOLD TSAI, individually; IRENA PETROVICH, individually; MARIA LITCHEL CAPIRAL, individually; EDITH EZEANI, individually; SABRINA REGENSBURG, individually; STEPHANIE ZANBRANO**,** individually**;** LUCIA SANDRA GONZALEZ, LUZMINDA WEE**,** and DOES 1 through 10 for monetary damages to redress for the decedent's injuries and death resulting from Defendants' deliberate indifference to her constitutional rights and liberties. Plaintiffs bring this action under the Fourth and Fourteenth Amendment of the United States Constitution and the Civil Rights Act of 1871, as codified at 42 U.S.C. § 1983, as well California state law for injuries and death suffered as a result of the Defendants' substantial and deliberate indifference to Decedent's health and welfare while in their care and custody. Plaintiff also states a claim against the Defendants for a failure to establish policies, procedures and training which resulted in the subject incident. This is a civil action seeking damages against the Defendants for committing acts under color of state law, and depriving Decedent of rights secured by the Constitution and laws of the United States (42 U.S.C. § 1983). Defendants, County of Los Angeles, and the LAC-USC officials

and medical staff, management and employees including, DOES "one" through "ten", were deliberately indifferent by, without limiting other acts and behaviors: failing to protect decedent from harm; failing to provide necessary and appropriate medical treatment,  over-sedating the decedent, failing to timely discharge the decedent back to her board and care, failing to prevent decedent from falling on several occasions, failing to provide a psychiatric treatment plan, excessive use of bed restraints, failing to reasonably assess the need for the continued use of restraints, failing to reasonably assess the continued administration of heavy sedatives, failing to utilize reasonable prophylactic measures to avoid multiple pulmonary emboli, and failing to heed to obvious signs and symptoms of a pulmonary embolism.  Defendants deprived the Decedent's rights as guaranteed by the Fourteenth Amendment to the Constitution of the United States against cruel and unusual punishment.

3. The Defendants, and LAC-USC medical officials, management and employees violated the decedent's constitutional rights and were deliberately indifferent by, without limiting other acts and behaviors: (1) deliberately ignoring and failing to heed to decedent's serious medical condition, to wit, decedent's numerous complaints and symptoms of a pulmonary embolism; (2) failing to assess decedent after numerous complaints of severe shortness of breath and related symptoms (3) failing to refer to a medical doctor and failing to transfer to a hospital for diagnostic testing and emergency treatment; (4) failing to train medical staff in symptom assessment of a pulmonary emboli (5) failing to implement policies and procedures on symptom assessment of pulmonary emboli (6) failing to formulate a reasonable patient discharge plan resulting in excessive and unnecessary sedation and eventual demise   As a consequence of the defendants' actions, Decedent Stella Summer suffered debilitating physical and emotional injuries including but not limited to multiple ground level falls, a head

injury, and eventually succumbed to multiple and fatal pulmonary emboli and ultimately her death, all of which constituted a clear deprivation of her constitutional rights.

## JURISDICTION AND VENUE

4. This action is filed under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and the Eighth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, to redress injuries and the death suffered by the plaintiff's decedent at the hands of defendants.

5. By a government claim form dated February 27, 2019, pursuant to Government Code §911.2, the County of Los Angeles, through its Clerk of the Board of Supervisors, was sent a Notice of Claim regarding violations of Plaintiff's decedent's constitutional rights. The claim stated the time, place, cause, nature and extent of the plaintiff's decedent's injuries. Plaintiff amended their claim on February 28, 2019.

6. On March 22, 2019, the county rejected Plaintiff's Tort claim.

7. This Court has jurisdiction over the federal civil rights claim pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has supplemental jurisdiction over any state-law claims pursuant to 28 U.S.C. § 1367(a).

8. At all relevant times, the Decedent was a patient at the Los Angeles county-USC hospital operated by the County of Los Angeles.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c).

## PARTIES

10. At all times relevant to this complaint, Plaintiff, Chrysie Anagnostou, hereinafter referred to as "ANAGNOSTOU", is the biological mother and successor-in-interest to Stella Summers, and is an individual residing in Los Angeles, California.

11. At all times relevant to this complaint, Plaintiff was also the legal conservator to her daughter, Stella Summers.

12. At all times relevant to this complaint, Stella Summers, hereinafter referred to as "SUMMERS", was a pretrial detainee, held against her will as "H&S 5150" patient. SUMMERS was resident at a board and care housing facility called "Vista Del Mar" when she was taken to the LAC-USC, in Los Angeles, California, where she died.

13. Defendant County of Los Angeles, hereinafter known as "COUNTY", is a government entity that acts through individuals to establish its policies and that is capable of being sued under federal law.

14. LAC-USC is at all times relevant to this complaint was a County Hospital operating under the jurisdiction of defendant COUNTY duly organized under the laws of the State of California.

15. Defendant ZHAOJUN HUANG, hereinafter referred to as "HUANG", is an employee of LAC-USC, a subsidiary of Defendant COUNTY, and at times relevant to the complaint was employed in the capacity of a nurse practitioner at LAC-USC. Defendant ZHAOJUN is a duly authorized employee and agent of LAC-USC, and was acting within the course and scope of her perspective official duties as medical staff in the LAC-USC with the complete authority and ratification of her principal, the County of Los Angeles. Defendant HUANG is being sued in her individual capacity.

16. Defendant LUZMINDA WEE, hereinafter referred to as "WEE", is an employee of LAC-USC, a subsidiary of Defendant COUNTY, and at times relevant to the complaint was employed in the capacity of a registered nurse at LAC-USC. Defendant WEE is a duly authorized employee and agent of LAC-USC, and was acting within the course and scope of her perspective duties as medical staff in the LAC-USC with the complete authority and ratification of her

principal, the County of Los Angeles.  Defendant WEE is being sued in her individual capacity

17.  Defendant MARA ALEJANDRA SIGALOS-RIVERA, hereinafter referred to as "SIGALOS-RIVERA", is an employee of LAC-USC, a subsidiary of Defendant COUNTY, and at times relevant to the complaint was employed in the capacity of a medical doctor at LAC-USC.  Defendant is a duly authorized employee and agent of LAC-USC, and was acting within the course and scope of her perspective duties as medical staff in the LAC-USC with the complete authority and ratification of her principal, the County of Los Angeles.  Defendant SIGALOS-RIVERA is being sued in her individual capacity

18.  Defendant DANIEL LEE JOHNSON, hereinafter referred to as " JOHNSON", is an employee of LAC-USC, a subsidiary of Defendant COUNTY, and at times relevant to the complaint was employed in the capacity of a medical doctor at LAC-USC.  Defendant is a duly authorized employee and agent of LAC-USC, and was acting within the course and scope of her perspective duties as medical staff in the LAC-USC with the complete authority and ratification of her principal, the County of Los Angeles.  Defendant JOHNSON is being sued in her individual capacity

19.  Defendant JEFFREY BERNARD CANCEKO, hereinafter referred to as " CANCEKO", is an employee of LAC-USC, a subsidiary of Defendant COUNTY, and at times relevant to the complaint was employed in the capacity of a medical doctor at LAC-USC.  Defendant is a duly authorized employee and agent of LAC-USC, and was acting within the course and scope of her perspective duties as medical staff in the LAC-USC with the complete authority and ratification of her principal, the County of Los Angeles.  Defendant CANCEKO is being sued in her individual capacity

20.  Defendant ARNOLD TSAI, hereinafter referred to as " TSAI", is an

employee of LAC-USC, a subsidiary of Defendant COUNTY, and at times relevant to the complaint was employed in the capacity of a medical doctor at LAC-USC.  Defendant is a duly authorized employee and agent of LAC-USC, and was acting within the course and scope of her perspective duties as medical staff in the LAC-USC with the complete authority and ratification of her principal, the County of Los Angeles.  Defendant TSAI is being sued in her individual capacity

21.   Defendant IRENA PETROVICH, hereinafter referred to as " PETROVICH", is an employee of LAC-USC, a subsidiary of Defendant COUNTY, and at times relevant to the complaint was employed in the capacity of a registered nurse at LAC-USC.  Defendant is a duly authorized employee and agent of LAC-USC, and was acting within the course and scope of her perspective duties as medical staff in the LAC-USC with the complete authority and ratification of her principal, the County of Los Angeles.  Defendant PETROVICH is being sued in her individual capacity

22.   Defendant EDITH EZEANI, hereinafter referred to as "EZEANI", is an employee of LAC-USC, a subsidiary of Defendant COUNTY, and at times relevant to the complaint was employed in the capacity of a licensed vocation nurse at LAC-USC.  Defendant is a duly authorized employee and agent of LAC-USC, and was acting within the course and scope of her perspective duties as medical staff in the LAC-USC with the complete authority and ratification of her principal, the County of Los Angeles.  Defendant EZEANI is being sued in her individual capacity

23.   Defendant MARIA LITCHEL CAPIRAL, hereinafter referred to as "CAPIRAL ", is an employee of LAC-USC, a subsidiary of Defendant COUNTY, and at times relevant to the complaint was employed in the capacity of a registered nurse at LAC-USC.  Defendant is a duly authorized employee and agent of LAC-USC, and was acting within the course and scope of her perspective duties as

medical staff in the LAC-USC with the complete authority and ratification of her principal, the County of Los Angeles. Defendant CAPIRAL is being sued in her individual capacity

24. Defendant SABRINA REGENSBURG, hereinafter referred to as "REGENSBURG", is an employee of LAC-USC, a subsidiary of Defendant COUNTY, and at times relevant to the complaint was employed in the capacity of a registered nurse at LAC-USC. Defendant is a duly authorized employee and agent of LAC-USC, and was acting within the course and scope of her perspective duties as medical staff in the LAC-USC with the complete authority and ratification of her principal, the County of Los Angeles. Defendant REGENSBURG is being sued in her individual capacity

25. Defendant STEPHANIE ZANBRANO, hereinafter referred to as "ZANBRANO", is an employee of LAC-USC, a subsidiary of Defendant COUNTY, and at times relevant to the complaint was employed in the capacity of a registered nurse at LAC-USC. Defendant is a duly authorized employee and agent of LAC-USC, and was acting within the course and scope of her perspective duties as medical staff in the LAC-USC with the complete authority and ratification of her principal, the County of Los Angeles. Defendant SIGALOS-RIVERA is being sued in her individual capacity

26. Defendant LUCIA SANDRA GONZALEZ, hereinafter referred to as "GONZALEZ", is an employee of LAC-USC, a subsidiary of Defendant COUNTY, and at times relevant to the complaint was employed in the capacity of as a nurse practitioner at LAC-USC. Defendant is a duly authorized employee and agent of LAC-USC, and was acting within the course and scope of her perspective duties as medical staff in the LAC-USC with the complete authority and ratification of her principal, the County of Los Angeles. Defendant GONZALEZ is being sued in her individual capacity

27.   Defendant SULLIVAN, first name unknown, hereinafter referred to as "SULLIVAN", is an employee of LAC-USC, a subsidiary of Defendant COUNTY, and at times relevant to the complaint was employed in the capacity of a psychiatrist at LAC-USC.  Defendant is a duly authorized employee and agent of LAC-USC, and was acting within the course and scope of her perspective duties as medical staff in the LAC-USC with the complete authority and ratification of her principal, the County of Los Angeles.  Defendant SULLIVAN is being sued in her individual capacity.

28.   Defendant SAMUEL TOMICH, , hereinafter referred to as "TOMICH", is an employee of LAC-USC, a subsidiary of Defendant COUNTY, and at times relevant to the complaint was employed in the capacity of a nurse at LAC-USC. Defendant is a duly authorized employee and agent of LAC-USC, and was acting within the course and scope of her perspective duties as medical staff in the LAC-USC with the complete authority and ratification of her principal, the County of Los Angeles.  Defendant TOMICH is being sued in her individual capacity.

29. Defendant MORRIS, first name unknown, hereinafter referred to as "MORRIS", is an employee of LAC-USC, a subsidiary of Defendant COUNTY, and at times relevant to the complaint was employed in the capacity of a psychiatrist at LAC-USC.  Defendant is a duly authorized employee and agent of LAC-USC, and was acting within the course and scope of her perspective duties as medical staff in the LAC-USC with the complete authority and ratification of her principal, the County of Los Angeles.  Defendant MORRIS is being sued in his individual capacity.

30.  At all relevant times to this complaint, Defendants acted under color of state law, to wit, they acted in the performance of their official duties, with the purpose and effect of influencing the behaviors of patients including SUMMERS, and used their badge of authority to deprive SUMMERS of her individual rights.

31.    DOES 1 through 10 are employees of defendant County of Los Angeles, and at all times relevant to the complaint were employed in the capacity of medical and misc. staff at LAC-USC hospital.   They are duly authorized employees and agents of the County of Los Angeles, and were acting within the course and scope of their perspective duties as staff at LAC-USC with the complete authority and ratification of their principal, Defendant County of Los Angeles.  DOES 1 thru 10 are sued in their individual and official capacities.

32.    At all times mentioned herein, each and every defendant was the agent of each and every other defendant and had the legal duty to oversee and supervise the hiring, conduct and employment of each and every defendant herein.

## FACTUAL ALLEGATIONS

33.    At all times relevant to this complaint, the decedent, Stella Summers, was a 19 year old woman of African-American and Greek decent, and resided in a board and care facility, Del Vista Mar at the request of ANAGNOSTOU. SUMMERS suffered from multiple co-occurring mental illnesses including bipolar disorder, borderline personality disorder, manic depressive disorder.

34. ANAGNOSTOU, obtained a conservatorship on July 24, 2018, and decided to place her daughter in a treatment facility in the hopes of finding the right combination of treatment and dosage of psychiatric medication that would stabilize her daughter's psychiatric episodes including delusions, running thoughts and compulsive behavior, all in the hopes her daughter would regain a normal quality of life.

35.    ANAGNOSTOU's conservatorship gave her the right to refuse treatment related specifically to SUMMERS's mental illness, and hence the right to refuse any and all treatment rendered LAC-USC.

36.    On September 21, 2018, a resident of Del Vista Mar complained to law

enforcement that SUMMERS had assaulted her. SUMMERS was then transported by LAPD and admitted to LAC-USC on a H&S 5150 hold due to delusional episodes and aggressive behavior.

37. Initially settled in the psychiatric emergency department, SUMMERS was placed on a cocktail of psychiatric and non-psychiatric medication including Albuterol (90 mcg/inh-Ashtma inhaler), Haldol (10mg), Haloperidol (3 mg Q6H PRN), Hydroxcyzine Hydrocholride 25 mg), Valproic Acid (Depakote 750 mg QPM; 500 mg QAM), Trazodone (150 mg), Seroquel, Risperidone (2mg), Benadryl and Ativan.

38. Haldol, an extremely potent anti-psychotic drug, acts as an instant tranquilizer, in effect putting the patient to sleep but can also cause side effects such as irregular mobility and backward ambulation.

39. SUMMERS' H&S 5150 hold expired on September 24th, however, against SUMMERS' wishes of wanting to return back to Del Mar Vista, she remained in the psychiatric emergency department at LAC-USC and was subsequently transferred to their psychiatric unit on September 27th.

40. On September 25th, at approximately 3:22 p.m., per emergency department doctor James Robert Tamai, SUMMERS' condition had apparently improved significantly to the point where she is medically stable, appeared to be lucid, and was not exhibiting any agitation or aggressive behaviors. SUMMERS was ready for a discharge. Said findings were also conveyed to defendant TSAI.

41. However, defendants failed to discharge SUMMERS as planned but rather kept at LAC-USC against both hers and her conservator ANAGNOSTOU's wishes.

42. All Defendants are aware of and bound by California (Health and Safety Code Section 1180.4(k) and Title 9, California Code of Regulations, Section 865.4) stating that a patient has the right to be free from the use of seclusion and

behavioral restraints of a form imposed as means of coercion, discipline, convenience, or retaliation by staff. These rights includes but is not limited, to the right to be free from the use of a drug used in order to control behavior or to restrict the persons' freedom of movement, if that drug is not a standard treatment for the person's medical or psychiatric condition.

43. According to California Code of Regulations, Title 22, Sect. 72018, "Chemical Restraint" is defined as a drug used to control behavior and used in a manner not required to treat the patient's medical symptoms.

44. From September 22nd to October 4th, defendants administered high dosages of sedative with various anti-psychotic drugs including Haldol due to a claimed continuous uncooperative behavior. Some side effects of Haldol include inability to communicate, unresponsiveness, nervousness, agitation and mental status changes, drowsiness and a high risk of injury due to falls. The half-life of Haldol from continued injections can be several days to weeks for the effects of the drugs to wane and dissipate from the body.

45. On September 23, at 12:25 p.m., according to medical records, SUMMERS was placed in restraints, as she was "agitated, verbally threatening to staff" per nurse Maria Hernandez -Lopez

46. On September 26th at 2:22 p.m., SIGALO RIVERA evaluates SUMMERS and acknowledges that she is "medically stable" and that she is awaiting discharge to her board and care facility. SUMMERS also appeared to be angry at the fact that she had been in emergency department for such an extended period of time, asking "why is it taking so long" to get a bed at an outside facility.

47. On September 26th at 7:45 p.m., SUMMERS is placed in hard restraints as being "agitated and unable to follow commands", per TOMICH's notes. However, TOMICH failed to indicate exactly which command she was unable to follow or why she was being agitated, unsafe to others or self. The absence of any credible

entry as the reason for placing SUMMERS in restraints delegitimizes the reason for placing her in restraints.

48. On September 26th, at 8:44 p.m., SUMMERS is still in restraints under claims on inability to follow commands and agitation, per nurse TOMICH. Again, there is no indication, other than the generic pop up entries from TOMICH's notes which would lead one to believe that there was a legitimate reason to restrain SUMMERS to her bed.

49. On Sept. 27th, at 8:02 a.m., defendant SIGALO-RIVERA orders the continued restraint of SUMMERS.

50. On Sept. 27th at 8:32 a.m., SUMMERS remains in a 4-point restraint, and ZAMBRANO notes that she is verbally aggressive and unable to follow commands, yet fails to document any physically aggressive conduct by SUMMERS to justify being physically restrained

51. On Sept. 27th at 7 p.m., ANAGNOSTOU visits her daughter and continues to observe a sedated and obtunded SUMMERS.

52. On September 28th at approximately 10:06 a.m., ANAGNOSTOU, as conservator to SUMMERS, instructs defendants' Medical Case Worker Darwin Givens that she wants her daughter discharged back to Del Mar Vista forthwith. After observing her daughter's shocking sedated condition, she wants it to immediately cease. Givens then contacted Mark Walker, a Del Mar Vista supervisor of plaintiff's wishes, who in turn acknowledged that SUMMERS' is welcomed back to the facility.

53. On September 28th at approx. 3:25 p.m., Nurse Practitioner Ivy De Quiros observes a calm and medically stable SUMMERS who is anxious to leave the hospital asking "when will I go home?"

54. On September 28th at approx. 8:20 p.m., ANAGNOSTOU visits her daughter and observes her daughter is unable to move in bed and her speech had

slowed down. SUMMERS further informs her that she could barely lift her legs and that she felt weak.

55. On September 28th, at 3:15 p.m, nurse De Quiros notes that SUMMERS is calm, unrestrained, ambulatory, and is medically cleared pending transfer back to Vista Del Mar. Further, Trazadone is to be discontinued to diminish polypharmacy.

56.   On September 29th at 6:34 p.m., ANAGNOSTOU, called the hospital to voice her concerns to the medical staff that her daughter's speech is slurred, that she cannot move when in bed, and has difficulty ambulating.

57.   In the morning of September 30th, due to heavy sedation, SUMMERS suffered an un-witnessed fall on her buttocks according to defendant HUANG nursing notes.

58.   On Sept. 30th, at approximately 9:45 a.m., SUMMERS voices her concerns to REGENSBURG that she has an unsteady gait due to the medication and to watch for her when she is standing. However, REGENSBURG is not concerned for SUMMERS' safety and advises against a sitter to watch for SUMMERS' gait, despite the known fact that SUMMERS had previously suffered a fall on September 27th and likely at other times during her stay Instead, REGENSBURG orders Atarax due to the patient "being agitated".

59.   On Sept. 30th at 2:27 p.m., HUANG places SUMMERS in restraint, citing an incident on the 27th when SUMMERS assaulted a sitter.

60. On Sept. 30th at 2:30 p.m.,, although REGENSBURG indicates that she will continue to "frequently assess need of restraints", no such efforts were ever made as SUMMERS is continuously shackled to her bed for an indefinite period  further restricting movement of her limbs.   Additionally, any assessment naturally included verbal responses from SUMMERS which were completely lacking as she had been heavily medicated to the point where she was either unable to respond or

comprehend the restraint release instructions given to her. In essence, SUMMERS continued to be restrained through no fault of her own, but rather due to an outright failure to assess the impact of the medication which should have been obvious to any reasonably trained medical personnel because SUMMERS was drooling, incoherent, unable to speak nor able to comprehend instructions.

61.  On Sept. 30th at 6:42 p.m., SUMMERS remains in a 2-point hard restraint per REGENSBURG's alleged evaluation.

62. From September 30th to October 3rd, SUMMERS remains in restraints, with short periods of time intervals when she is has not restrains on. She is further allowed minimal walks.

63. On October 1, 2018 at approximately 1:30 p.m., GONZALEZ notes "patient not cooperative with nursing staff, aggressive outbursts" yet fails to observe any physical behavior warranting the need for the continued restraints.

64.On October 1, 2018 at approximately 1:30 p.m., a very drowsy SUMMERS is taken off restraints and allowed to get up from her bed and walk, however, PETROVICH allows SUMMERS to ambulate backwards creating an obvious risk of fall given her obtunded condition. SUMMERS, who is sedated, is mumbling and drooling as she walks backward while PETROVICH places her hand on her back which further encourages the backward ambulation.

65.     On October 1, 2018, ANAGNOSTOU visited her daughter, and again to her shock, observed an obtunded, drooling, mumbling and basically a non-responsive SUMMERS, who was unable to answer her questions. ANAGNOSTOU then instructed the psychiatric team to reduce the sedative medication as her daughter was clearly unable to function on the high dosage of medication the defendants administered to her daughter. Again, Plaintiff asked if her daughter had walked and any kind of mobility of her lower extremities. Plaintiff further observed bed sores on her daughter's back and informed

REGENSBURG of the same.

66.     In the morning of October 2, 2018, ANAGNOSTOU visits her daughter and decides to document her daughter's obtunded and non-responsive condition by video recording with her cell phone. However, defendant nurses quickly notified a Sheriff's deputy who eventually ordered ANAGNOSTOU to cease recording her daughter's condition.

67.     On October 2, 2018, at approximately 2:22 p.m., Chaplain Michelle Suh visited SUMMERS and observed a sedated patient who was unable to respond to her questions. When asked of the nurse why SUMMERS was unable to communicate, the nurse responded that SUMMERS "does not usually speak" which is a false since there is ample evidence in the medical notes that she had spoken to nurses early on during her stay. It is further unknown which nurse responded that SUMMERS "does not usually speak", but it is self-evident that nursing staff was deliberately indifferent to SUMMERS' medical needs as she is being handed off from one nurse onto the next with absolutely no assessment as to either any prophylactic measures to minimize the risk of blood clots nor is there any assessment as to the impact and effect of the heavy doses of anti-psychotic tranquilizers wreaking havoc in SUMMERS' body.

68.     As of October 2, 2018, at approximately 3 p.m., according to defendants CANCEKO, TSAI, SIGALOS and SULLIVAN's communication orders, patient SUMMERS was *not* allowed to refuse any psychiatric medication, but if she did, all medical staff was ordered to immediately administer 10 mg of Haldol *and* 25 mg of Benadryl, intramuscularly, for each refusal.

69.     On October 3, 2018 at approximately 6:39 a.m., SUMMERS is medicated with Trozadone despite medical orders on September 28th for the drug to be discontinued due to polypharmacy. As a result, SUMMERS is confined to her bed, unable to move during the entire day. EZEANI fails to assess

SUMMERS for polypharmacy, mobility and prophylactic measures.

70.     On October 3, 2018, at approximately  SUMMERS was evaluated by GONZALEZ and deemed to be medically stable, and to discontinue all psychotropic medications as SUMMERS demonstrated a number of personality traits, was not psychotic  and to be discharged back to Vista Del Mar.

71.     On October 3rd at approximately 10:39 a.m., social worker Cheryl Lynch, hereinafter referred to as "LYNCH", from the Department of Children and Family Services assigned to SUMMERS visited paid her a visit to see if the patient was psychiatrically stable to return to her group home at Vista Del Mar. However, to her surprise, she observed a heavily sedated SUMMERS, who was unable to speak, was drooling from her mouth, could not communicate nor answer any of her questions. She also observed SUMMERS restrained to her bed.

72.     On October 3rd, at approximately 11:00 a.m., ANAGNOSTOU also visited her daughter in the presence of MORRIS, SUMMER's psychiatrist. During the consult, SUMMERS expressed to ANAGNOSTOU her fear of dying stating: "I am dying! I am dying!" to which MORRIS responded that she was not going to die, not to worry and that SUMMERS will be *okay*.

73.     On October 4th at approximately  7:08 a.m., ANAGNOSTOU called the hospital and asked Okoro Chioma, R.N. whether her daughter had walked at all during the nurse' shift and was told that she had not. At around 11:20 a.m. LYNCH visited SUMMERS again to see if the patient was psychiatrically stable to return to her board and care at Vista Del Mar. Again she observed a very sedated SUMMERS.

74.     On October 4th at approximately  11:30 a.m., Defendants nurses and staff including WEE and HUANG assisted SUMMERS from her bed onto her feet and left the patient's room. Suddenly, SUMMERS collapses, striking the back of her head on the ground. Defendants WEE and HUANG failed to pay attention to a

drowsy and heavily sedated SUMMERS causing yet another fall to occur. The lift team picked SUMMERS back up and carried her to her bed. SUMMERS fell backward and struck her head on the floor.

75.     As the lift team placed SUMMERS back onto her back, SUMMERS' lips were noticeably bluish in coloration, her eyes had rolled backward, she was sweating profusely, and began to desperately gasp for air while, in her sedated condition. She also complained of back pain and headaches.  However, Defendants ignored the obvious shortness of breath complaints and instead restrained her to her bed choosing to believe that she was agitated and restless, instead.

76.     For the next two and half hours (2.5) hours or from approximately 11:40 a.m. until 2:00 p.m., SUMMERS continuously gasped for air and complained to the defendants that she could not breathe, repeatedly pleading "I need more oxygen!"

77.     A CT Scan was ordered at 11:31 a.m., due to SUMMERS' recent fall, but after about an hour and half waiting for a CT Scan, SUMMERS was eventually denied the scan due to "another emergency patient" at the same time.

78.     At approximately 12:20 p.m., defendants WEE, per HUANG's order, administered more sedative drugs (Ativan 2mg via IV) in response to SUMMERS' complaints of her inability to breathe! The sedatives likely amplified SUMMERS' shortness of breath making it even more difficult to breathe. WEE failed to use her own independent judgment and assess an obviously apneic SUMMERS.

79.   At approximately 1:55 p.m., WEE was about to administer yet another dose of Benadryl sedative when after two-and-half hours of continuous complaints and imploring for help, SUMMERS loses consciousness and a code blue is called.

80. At 2:04 p.m., a code blue team responds including defendant Dr, JOHNSON and doctor Patel. From 2:04 p.m to 3:04 p.m. a series of epinephrine and bicarbonate injections with intermittent CPR was administered.  During the rescutitative efforts, although SUMMERS had obvious biomarker signs of a pulmonary embolism, such as shortness of breath, hyperventilation, low blood pressure, tachycardia, and an ultrasound confirming a dilated right heart ventricle, Dr. JONHSON failed to administer a blood clot dissolving agent, or a TPA until 9 minute before SUMMER passed. Contrary to Dr.  JOHNSON's assertion that CPR was administered for 30 min post-TPA administration, the Code Blue record indicate that TPA had not been administered until 2:55 pm, or 7 minutes before resuscitative efforts ceased.

81.Defendants when being cardio pulmonary resuscitative which lasted approximately one hour. However, such efforts proved futile as SUMMERS was pronounced dead at 3:00 p.m. on October 4th.

82. At around 2:30 p.m., ANAGNOSTOU called the hospital to speak to SUMMER's assigned nurse and to check in with her daughter. WEE informed ANAGNOSTOU that her daughter was having complications due being "fat", that she could not breathe and that the plan was to take her to ICU, which never took place.

83. An autopsy revealed that SUMMERS died of pulmonary emboli due to deep vein thromboses; this means that she developed  numerous blood clots during her immobilization at LAC-USC, and the clots travelled to her lungs, in effect clogging blood vessels and preventing the flow of oxygenated blood. Three of the four lobes of her lungs contained blood clots. The autopsy findings further revealed that SUMMERS also suffered from blunt force trauma to her skull with associated scalp hemorrhages in the occipital and posterior parietal and had

multiple emboli in the upper and lower lobes of the left lung and in the lower lobe of the right lung. The coroner also noted a pronounced laceration to the liver and associated 100 ml blood loss likely due to prolonged chest compressions when they were administered . Dissection of the deep veins of the legs also revealed suspected blood clots. Lastly, in addition to his findings, the coroner took the liberty to indicate risk factors for deep vein thrombosis including *immobilization* and obesity, noting "A deep venous thrombosis can become dislodged and travel to the lungs where it can become lodged in the pulmonary vasculature (pulmonary embolism). If large enough or numerous enough, this can block the blood flow back to the heart and cause death".

84.     Stella Summers was 19 years of age when she passed away.

## FIRST CLAIM FOR RELIEF
### Deliberate Indifference to a Substantial Risk of Harm
### to Health (42 U.S.C. § 1983,  14th Amendment of the U.S. Constitution,
### (Against all Defendants and DOES 1-10 )

85.   Plaintiff repeats and re-alleges each and every allegation in paragraphs 1-3, and 33 through 84 of this Complaint with the same force and effect as if fully set forth herein.

86.   Defendants made an intentional decision with respect to the conditions under which SUMMERS was confined, to wit, they over-medicated with powerful psychotic and sedative drugs, they over-restrained her with the excessive use of restraints to her bed, they failed to discharge her back to her board and care when she was psychiatrically stable to do so, and intentionally ignored obvious symptoms of pulmonary embolism leading up to her death.

87.   Defendants   TOMICH,   ZAMBRANO,   PETROVICH,   CAPIRAL, GONZALEZ AND EZEANI were directly responsible in either initially assessing the need to place SUMMERS in restraints or the continued need to remain in physical restraints by engaging in a "Face-to-face" evaluations. Specifically, on

September 23rd , 26th, 27th, 30th and October 1st each defendant allegedly assessed SUMMERS as "*agitated and unable to follow command, inhibiting medical care, verbally aggressive",* yet given the cocktail of mind numbing psychiatric medication that SUMMERS was on, she hardly would have been a threat of danger that defendants portrayed her to be nor would she be able to comprehend what commands she needed to follow, all so as to take away her liberty and freedom of movement.   Defendants took away SUMMERS' liberty not because she was a threat but more because they were afraid of her, citing to a past incident and claiming that she was actively agitated to justify extended periods of restraint and immobilization.

88.     Those conditions, the extended period of immobilization, the over medicating, and ignoring symptoms of a pulmonary embolism, placed SUMMERS at a substantial risk of suffering serious harm and death, to wit developing blood clots, and the high risk they would travel to the lungs, heart or brain.

89.     Defendants failed to take reasonable available measures to abate such risk of fatality.

90.     The defendant's failure to take those measures caused SUMMERS' death.

91.   The Defendants, by ignoring SUMMERS in this situation and by failing to provide proper medical attention, acted with deliberate indifference to a serious health condition and the medical needs of SUMMERS.

92.   Such acts and omissions of the Defendants violated SUMMERS' constitutional rights guaranteed under 42 U.S.C. § 1983, and the Fourteenth Amendments to the United States Constitution. The defendants knew that by failing to treat the urgent symptoms of a pulmonary emboli, to with complaints of shortness of breath, that it would lead to a fatality, but not before SUMMERS endured significant pain and agony during the period preceding her death.

93.     Accordingly, Defendants each are liable to Plaintiffs for compensatory and punitive damages under 42 U.S.C. § 1983.

## SECOND CLAIM FOR RELIEF
### Unreasonable Seizure-4[th] Amendment
### Violation-42 U.S.C. § 1983
### (Against all Defendants)

94.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1-3, 33 through 84 and 87 of this Complaint with the same force and effect as if fully set forth herein.

95.     SUMMERS was entitled under the 4th Amendment of the Constitution to be free from an unreasonable seizure of her body by the government. The right to free from an unreasonable seizure includes the right to be free from an unlawful and unreasonable detention.

96.     Once SUMMERS' 5150 hold expired and after she became psychiatrically and medically stable, COUNTY and defendants violated her 4th Amendment right when they failed to discharge her and detained her against her will and to her ultimate peril.

97.     As a direct and proximate result of the unlawful seizure, SUMMERS and Plaintiff suffered pre-death pain and suffering, loss of life, loss of the opportunity of life, and reasonable attorney's fees.

## THIRD CLAIM FOR RELIEF
### Battery (State)
### (Against all defendants)

98.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1-3, 33 through 84 and 87 of this Complaint with the same force and effect as if fully set forth herein.

99.     At all relevant times of the complaint, SUMMERS through her conservator, ANAGNOSTOU,  had a right to refuse treatment and to refuse antipsychotic drugs.

100.     At all relevant times of the complaint, Defendants and each of them, either directly or in conspiracy with one another intended to restrain SUMMERS of her liberty while in their custody.

101.     Such intent to restrain SUMMERS' liberty was conducted with numerous non-consensual hard restraints and numerous non-consensual injections of sedative drugs such as Ativan, Benadryl and Haldol.

102.     Such non-consensual injections and hard point restraints constitute an unlawful touching or battery to SUMMERS.

103.     Specific to the physical restraints, defendants TOMICH, ZAMBRANO, PETROVICH, CAPIRAL, GONZALEZ AND EZEANI are liable to SUMMERS for battery by causing an unlawful touching when committing all aforementioned acts as contained in paragraph 87 in order to restrain her freedom.

**FOURTH CLAIM FOR RELIEF**
**Negligence (state)**
**(Against Defendants WEE, HUANG, EZEANI, PETROVICH and DOES 1-2)**

104.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1-3, 33 through 84 and 87 of this Complaint with the same force and effect as if fully set forth herein.

105.     Defendants and each of them owed a duty of care to ensure SUMMERS did not unreasonably injure herself during her stay while in their custody.

106.     Specifically, Defendants WEE, HUANG, EZEANI, PETROVICH and DOES 1-2 owed a duty of care to ensure SUMMERS was assisted at all times while getting in and out of her bed and while moving around on her feet.

107.     Defendants WEE, HUANG, EZEANI, PETROVICH and DOES 1-2 breached their duty of care to SUMMERS when they allowed on two documented instances, the patient to fall backwards during a supposed assisted mobility walk. Defendant further breached their duty of care when they enabled a cognitively incapacitated SUMMERS to walk backwards therefore increasing the risk of falling.

108.     Said breach of duty was a direct and proximate cause of the ultimate harm suffered to SUMMERS, to wit, a head injury and her deep vein thrombosis, or blood clots in the back of her lower legs became dislodged after the patient fell backwards, as evidenced by hemorrhage to the back of her head, travelling upwards and causing a fatal pulmonary emboli.

### FIFTH CLAIM FOR RELIEF
**Medical Negligence (state)**
**(Against Defendants and DOES 1-10)**

109.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1-3, 33 through 84 and 87 of this Complaint with the same force and effect as if fully set forth herein.

110.      Pursuant to section 815.2 of the California Government Code, a public entity is liable for the injuries caused by its employees within the scope of the employment if the employee's act would subject him or her to liability.

111.     Defendants, and each of them, have a duty to operate and manage the LAC-USC in a manner so as to prevent the acts and/or omissions alleged herein.  Said defendants owed SUMMERS, as a 5150 detainee, care and control, a duty of due care to protect her health and physical safety.

112.     Defendants and each of them were negligent and their conduct fell below a reasonable standard of care when they failed to discharge their duties as health care providers to SUMMERS.  It was foreseeable that as a result of Defendants' acts and omissions, as described above, SUMMERS would develop

injuries, suffering, and death.  Defendants' breach proximately caused injuries and damages to SUMMERS as Plaintiffs claim herein.

113.    As a direct and proximate result of the defendants' aforementioned conduct, the Plaintiff sets forth that the defendants are liable to her for damages including but not limited to funeral and burial related expenses, and damages to provide for the Plaintiff's deprivation and injury as a result of the loss of the decedent's support, comfort, counsel, familial relations, aid, association, care and services.

### SIXTH CLAIM FOR RELIEF
**False Imprisonment**
**(State) (Against all Defendants)**

114.    Plaintiff repeats and re-alleges each and every allegation in paragraphs 1-3, 33 through 84 and 87 of this Complaint with the same force and effect as if fully set forth herein.

115.    At all relevant times to this complaint, Defendants and each of them, detained Plaintiff's decedent against both hers and her conservator's will after the 72 hour 5150 hold expired and as soon as Plaintiff was psychiatrically stable to return to her board and care. According to her medical records, SUMMERS was assessed to be medically stable and to be discharged as early as September 25, 2018.

116.    Neither SUMMERS nor ANAGNOSTOU gave consent for any additional detention and/or purported treatment at the COUNTY facility. In fact, the evidence shows that both SUMMERS and ANAGNOSTOU desired for SUMMERS to return back on numerous occasions days leading up to her death.

117.    By being restrained with 4-point shackles, and continuously monitored within her hospital room, SUMMERS was restrained against her will without any justification, in light of multiple admissions from the defendants that she was psychiatrically stable to be discharged.

118.     Due to the involuntary restraint of her freedom, SUMMERS was subjected to continuous injections of powerful sedative drugs, causing extensive periods of immobilization, which predictably caused her to develop blood clots, ultimately killing her.

119.     As a direct and proximate result of the defendants' aforementioned conduct, the Plaintiff, successors-in-interest for SUMMERS set forth that the defendants are liable to her for damages including but not limited to funeral and burial related expenses, and damages to provide for the Plaintiffs' deprivation and injury as a result of the loss of the decedent's support, company, comfort, counsel, familial relations, aid, association, care and services.

## SEVENTH CLAIM FOR RELIEF
### Failure to Train (42 U.S.C. §1983)
### (Against Defendant COUNTY)

120.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1-3, 33 through 84 and 87 of this Complaint with the same force and effect as if fully set forth herein.

121.     Defendant COUNTY knew that SUMMERS was suffering from an emergency medical condition and that the LAC-USC unit was not equipped to care for chronically ill psychiatric patients. Given the known limitations of the LAC-USC psychiatric unit it was obvious that LAC-USC medical staff would need special training in order to care adequately for medically unstable patients and to assess whether such patients should be transferred to long term care facilities.

122.     Defendants had not been trained adequately in monitoring, documenting and assessing psychiatrically stable patients within the confines of a limited long term psychiatric care facility such as the LAC-USC, and that this failure to train led to a reckless treatment and care to SUMMERS, ultimately resulting in her death. Instead, Defendants physicians and nurses continued to keep SUMMERS in a sedated condition at the high risk and ultimate demise.

123.     Despite COUNTY's general hospital policy requiring that medically stable psychiatric patients be seen by a doctor and transferred back to an outside board and care facility, COUNTY had failed to train the LAC-USC doctors and nursing staff adequately as to recognize that patients who stay past their date of medical stabilization cannot be controlled with over sedation and/or unnecessary restrained to their bed and against their will.

124.     Defendant COUNTY had a policy of relying on medical professionals without training them on how to implement proper procedures for documenting, assessing and discharging psychiatrically stabled patients and such failure amounts to deliberate indifference to SUMMERS' constitutional rights.

125.     As a result of the COUNTY's failure to adequately train and implement policies, SUMMERS was caused undeserved pain and agony all culminating to her death on October 4, 2018.

**EIGHTH CLAIM FOR RELIEF**
**Substantive Due Process Violation**
**(14th Am. -42 U.S.C. §1983)**
**(Against all Defendants)**

126.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1-3, 33 through 84 and 87 of this Complaint with the same force and effect as if fully set forth herein.

127.     Plaintiff had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive him of life, liberty, or property in such a manner as to shock the conscience, including but not limited to unwarranted state interference in Plaintiff's familial relationship with her daughter, SUMMERS.

128.     SUMMERS also had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive him of life, liberty, or property in such a manner as

to shock the conscience, including but not limited to unwarranted state interference in SUMMERS' familial relationship with her mother, Plaintiff.

129.     The aforementioned actions of Defendants along with other undiscovered conduct, shock the conscience, in that they acted with deliberate indifference to the constitutional rights of SUMMERS and Plaintiff, with purpose to harm unrelated to any legitimate law enforcement objective.

130.     As a direct and proximate result of these actions, SUMMERS experienced pain and suffering and eventually died. Defendants thus violated the substantive due process rights of Plaintiff to be free from unwarranted interference with their familial relationships with SUMMERS.

131.     As a direct and proximate cause of the acts of Defendants, Plaintiff suffered emotional distress, mental anguish, and pain. Plaintiff has also been deprived of the life-long love, companionship, comfort, society, care and sustenance of SUMMERS, and will continue to be so deprived for the remainder her natural lives.

132.     The conduct of Defendants was willful, wanton, malicious, and done with reckless disregard for the rights of and safety of SUMMERS and Plaintiff therefore warrants the imposition of exemplary and punitive damages as to Defendants.

133.     Plaintiff brings this claim individually and as successor-in-interest to SUMMERS, and seeks both survival damages and wrongful death damages. Plaintiffs also seek attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request entry of judgment in their favor and against all Defendants, and DOES 1 through 10 inclusive, as follows:

1.     For compensatory damages according to proof;

2.      For punitive damages against the individual defendants in an amount to be proven at trial;

3.      For interest;

4.      For reasonable costs of this suit and attorneys' fees per 42 U.S.C. §1988; and

5.      For such further other relief as the Court may deem just, proper, and appropriate.

Date: June 22, 2020                    THE SEHAT LAW FIRM, PLC

By*: /s/ Cameron Sehat*_____
Attorney for Plaintiff,
Chrysie Anagnostou

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial.

Date: June 22, 2020           THE SEHAT LAW FIRM, PLC

By: *: /s/ Cameron Sehat*___
Attorney for Plaintiff
Chrysie Anagnostou